04-14977srd

CDP

RECEIVED

APR 1 3 2005

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

Mr. James G. Woodward
Clerk
U.S. DISTRICT COURT, EASTERN MISSOURI
111 S. Tenth Street
St. Louis, MO  63102

**UNITED STATES COURT OF APPEALS**
FOR THE EIGHTH CIRCUIT
THOMAS F. EAGLETON COURT HOUSE
ROOM 24.329

**MICHAEL E. GANS**
**Clerk of Court**

RECEIVED

APR 1 3 2005

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

111 S. 10TH STREET
ST. LOUIS, MISSOURI 63102

VOICE (314) 244-2400
FAX (314) 244-2780
www.ca8.uscourts.gov

April 13, 2005

Mr. James G. Woodward
Clerk
U.S. DISTRICT COURT, EASTERN MISSOURI
111 S. Tenth Street
St. Louis, MO   63102

Re:   04-1497   Universal Underwrite vs. Lou Fusz Automotive

Dear Clerk:

The mandate of this Court is being sent to the clerk of the district court, together with a receipt. The clerk of the district court is requested to sign, date, and return the receipt to this office.

Any district court records in this court's possession will be returned shortly.

(5175-010199)

Sincerely,

Michael E. Gans
Clerk of Court

srd

Enclosure

(LETTER FOR INFORMATIONAL PURPOSES ONLY)
----------------------------------------
cc:   Honorable Catherine D. Perry
      Roger K. Heidenreich
      Max H. Stern
      William S. Berman
      Christopher L. Kanzler
      Jay L. Kanzler Jr.
      Karl W. Dickhaus
      John D. Briggs
      Steven Howard Schwartz

District Court/Agency Case Number(s):   4:02cv01647-CDP

# UNITED STATES COURT OF APPEALS

### FOR THE EIGHTH CIRCUIT

No.  04-1497

Universal Underwriters Insurance     *
Company, a Kansas corporation,       *
                                     *
     Appellant,                      *  Appeal from the United States
                                     *  District Court for the
     vs.                             *  Eastern District of Missouri
                                     *
Lou Fusz Automotive Network, Inc.,   *
a Missouri corporation; Onsite       *
Computer Consulting Services, Inc.,  *
a Missouri corporation,              *
                                     *
     Appellees,                      *
                                     *
West Brothers Chrysler, Inc;         *
Stephenson Electric Company,         *
                                     *
     Defendants.                     *

## JUDGMENT

This appeal from the United States District Court was submitted on the record of the district court, briefs of the parties and was argued by counsel.

After consideration, it is  hereby  ordered and adjudged that the judgment of the district  court in this cause is affirmed in accordance with the opinion of this Court.

(5172-010199)

March 21, 2005

Order Entered in Accordance with Opinion:

*Michael G. Gans*

Clerk, U.S. Court of Appeals, Eighth Circuit.

A TRUE COPY OF THE ORIGINAL
MICHAEL E. GANS, CLERK
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
BY: *Michael G. Gans*

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

No. 04-1497

| | |
|---|---|
| Universal Underwriters Insurance Company, a Kansas corporation, | * * * |
| Plaintiff - Appellant, | * * |
| v. | * * |
| Lou Fusz Automotive Network, Inc., a Missouri corporation; Onsite Computer Consulting Services, Inc., a Missouri corporation, | * Appeal from the United States<br>* District Court for the Eastern<br>* District of Missouri.<br>* |
| Defendants - Appellees, | * * |
| West Brothers Chrysler, Inc.;<br>Stephenson Electric Company, | * * * |
| Defendants. | * |

Submitted: January 13, 2005
Filed: March 21, 2005

Before MELLOY, SMITH, and COLLOTON, Circuit Judges.

MELLOY, Circuit Judge.

Onsite Computer Consulting Services ("Onsite") brought a class action lawsuit against Lou Fusz Automotive Network, Inc. ("Lou Fusz") in state court under the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "Act"), a federal statute that prohibits unsolicited fax advertisements. Lou Fusz tendered the claim to its insurer, Universal Underwriters Insurance Company ("Universal"). Universal agreed to provide a defense under a complete reservation of rights and subsequently instituted this action to seek declaratory judgment regarding its duty to defend and indemnify Lou Fusz. The district court[1] determined that Universal owed Lou Fusz a defense. The district court also determined that it could not resolve the issue of indemnification until after resolution of the state court action. We affirm.

### I. Background

Onsite brought its state court, class-action petition on behalf of all persons harmed by Lou Fusz's alleged transmission of unsolicited fax advertisements. Onsite sought class certification, injunctive relief, and "[a]n award of the full amount of statutory damages allowed under 47 U.S.C. § 227(b)(3), including treble damages, sustained by Onsite and the Class . . . ." The Act provides for damages in the amount of actual monetary loss or $500 per violation, whichever is greater. 47 U.S.C. § 227(b)(3)(B). The Act also permits up to treble damages for knowing and willful violations. Id. at § 227(b)(3). In its answer to the state court complaint, Lou Fusz denied that it sent unsolicited advertisements or authorized anyone to send unsolicited advertisements on its behalf. Lou Fusz also alleged that it had permission to send all challenged faxes.

---

[1] The Honorable Catherine D. Perry, United States District Judge for the Eastern District of Missouri.

-2-

In response to the present declaratory judgment action, Onsite and Lou Fusz
joined forces to argue in favor of coverage under the policy. Universal presented
numerous arguments against coverage that depended upon the policy's definitions of
the terms "INJURY" and "DAMAGES."[2] Universal argued that Onsite sought only

---

[2] The relevant policy language is as follows:

INSURING AGREEMENT – WE will pay all sums the INSURED
legally must pay as DAMAGES (including punitive DAMAGES where
insurable by law) because of INJURY to which the insurance applies
caused by an OCCURRENCE arising out of GARAGE OPERATIONS
or AUTO HAZARD.
\* \* \*

We have the right and duty to defend any SUIT asking for these
DAMAGES. WE may investigate and settle any claim or SUIT WE
consider appropriate.   OUR payment of the limit shown in the
declarations ends OUR duty to defend.
\* \* \*

"DAMAGES" means amounts awardable by a court of law. . . .
DAMAGES does not mean civil penalties, fines or assessments.
\* \* \*

"INJURY" means, with respect to:

Group 1 – bodily injury, sickness, disease or disability (including death
resulting from any of these) or damage to or loss of use of tangible
property;
\* \* \*

Group 3 – false arrest, false imprisonment, wrongful eviction, wrongful
detention, malicious prosecution, abuse of process, libel, slander,
defamation of character, private nuisance (except pollution), invasion of
rights of privacy or possession of personal property;

Group 4 – plagiarism, misappropriation of advertising ideas or style,
infringement of copyright, title, slogan or trademark;
\* \* \*

With respect to INJURY Groups 3,4, 5 and 6, OCCURRENCE means

-3-

fixed damages of $500 per violation as permitted under the Act and that the fixed damages were "civil penalties, fines or assessments" excluded from the policy's definition of DAMAGES. Universal also argued that the alleged violations of the Act did not qualify for coverage under any of the policy's definitions of INJURY. Finally, Universal argued that violations of the Act were intentional and therefore excluded from coverage.

Lou Fusz moved for summary judgment, which the district court granted. The district court concluded that Onsite sought all available damages, not merely fixed damages. The district court also concluded that even if Onsite had sought only fixed damages, such damages were not "civil penalties" that would be excluded from coverage under the policy, but rather, were at least in part a liquidated sum representing uncertain and hard-to-quantify actual damages. The district court determined that an alleged violation of the Act qualified as a private nuisance, and therefore a Group 3 INJURY under the policy, but the district court did not address whether a violation of the Act satisfied any of the other definitions of INJURY. The district court found that the issue of intent was unresolved and therefore Universal could not be relieved of its duty to defend based on the allegedly intentional nature of Lou Fusz's actions. Finally, the district court found Universal's claim regarding a duty to indemnify Lou Fusz premature and dismissed that claim without prejudice.

## II. Discussion

Under Missouri law, the interpretation of an insurance policy is a question of law. Standard Artificial Limb, Inc. v. Allianz Ins. Co., 895 S.W.2d 205, 209 (Mo. Ct. App. 1995). Accordingly, our review is de novo. In addition, this case comes to us

acts of the INSURED during the Coverage Part period which result in such INJURY.

-4-

following a grant of summary judgment, which we review de novo. Royal Ins. Co. of America v. Kirksville Coll. of Osteopathic Med., Inc., 304 F.3d 804, 806 (8th Cir. 2002).

"The duty to defend is broader than the duty to indemnify." McCormack Baron Mgmt. Servs. Inc. v. American Guarantee & Liab. Ins. Co., 989 S.W.2d 168, 170 (Mo. 1999) (en banc). The duty to defend exists where there is a potential liability. Id.; Royal Ins. Co. of America, 304 F.3d at 807 ("[Under Missouri law] the insurer's duty to defend arises when there is merely the *potential* for coverage."). In assessing whether there is a duty to defend, we must compare "the language of the policy with the allegations in the petition." Auto Club Family Ins. Co. v. Jacobsen, 19 S.W.3d 178, 182 (Mo. Ct. App. 2000). In construing the policy, we must give each term its ordinary, lay meaning unless the policy expressly defines a term in a technical manner. Farmland Inds., Inc. v. Republic Ins. Co., 941 S.W.2d 505, 508 (Mo. 1997) (en banc). Finally, we must resolve any ambiguities in favor of coverage. Aetna Cas. & Sur. Co. v. Haas, 422 S.W.2d 316, 321 (Mo. 1968) ("[T]he language must be construed so as to give the insured the protection which he reasonably had a right to expect; and to that end any doubts, ambiguities and uncertainties arising out of the language used in the policy must be resolved in his favor.") (internal quotation omitted).

For there to be a potentially covered liability, the complaint must allege DAMAGES as defined in the policy. The policy's definition of DAMAGES excludes "civil penalties, fines or assessments" but includes punitive damages (where punitive damages are insurable as a matter of law). Universal argues that Onsite requested only the fixed damages available under the Act and that these fixed damages are "civil penalties" under the policy.

Onsite sought "[a]n award of the full amount of statutory damages allowed under 47 U.S.C. § 227(b)(3), including treble damages . . . ." We believe that Onsite's

-5-

reference to the "full amount of statutory damages" is a broad request for all forms of available relief or for the most favorable among the alternative forms of available relief. Although, in general, the phrase "statutory damages" may be understood as a limited reference only to fixed damages available under a statute, such a construction fails in the present case. If we adopt a limited interpretation of the wording "statutory damages" as set forth in the complaint, the complaint's following phrase "including treble damages" makes no sense. If the full amount of statutory damages *includes* treble damages, then the term "statutory damages" as used in the complaint cannot be limited only to the fixed $500 amount. Because Onsite sought the "full amount of statutory damages" we believe it is clear that Onsite requested exactly what the Act provides: the greater of actual monetary loss or a fixed sum of $500 per violation, plus treble damages if appropriate.

Universal also argues that Onsite failed to allege any harm, and therefore only stated a claim for fixed damages. The facts as alleged, however, plainly identify harm to Onsite. Onsite alleged that it received an unsolicited fax. Although the monetary impact of a single unsolicited fax is minor, it is nevertheless a cost borne by the recipient and recognized by Congress as a compensable harm. See, e.g., Missouri ex rel. Nixon v. American Blast Fax, Inc., 323 F.3d 649, 654-55 (8th Cir. 2003) (listing the various harms caused by the receipt of unsolicited faxes).

Even if Onsite had sought only fixed damages under the Act, we would still construe the complaint as having alleged DAMAGES under the policy. Universal elected not to define the term "civil penalties" when it drafted the policy. Because the policy does not contain a technical definition for the phrase "civil penalty," we must use the term's lay meaning. If we find that the lay meaning is ambiguous, or that there is more than one reasonable lay meaning for the term, we must adopt the meaning that supports a finding of coverage. Aetna Cas. & Sur. Co., 422 S.W.2d at 321. According to Universal, the lay meaning of the term "civil penalty" is any award that exceeds dollar for dollar compensation for actual loss and has a punitive or

-6-

deterrent effect. Lou Fusz and Onsite, on the other hand, argue that a lay person would understand a "civil penalty" to be an amount awarded to a public or governmental body. We disagree with the former interpretation and need not adopt the latter.

Initially, we note that Universal's proffered interpretation is unworkable when read "in the context of the policy as a whole." Columbia Mut. Ins. Co. v. Schauf, 967 S.W.2d 74, 77 (Mo. 1998) (en banc). The policy's definition of DAMAGES includes amounts awarded as punitive damages. Accordingly, we cannot accept a definition for "civil penalty" that excludes from the definition of DAMAGES all awards with a punitive or deterrent effect. Such an interpretation would create an internal inconsistency in the policy in which one section would authorize the coverage of punitive awards and another would specifically exclude such awards from coverage.

Further, even if Universal's proffered definition did not create an internal inconsistency, a duty to defend would exist because a portion of the fixed amount represents a liquidated sum for uncertain and hard-to-quantify actual damages. We noted in Nixon, 323 F.3d at 654-55, that Congress identified the loss of use of equipment and phone lines for outgoing and incoming faxes, the expense of paper and ink, and the resultant inconvenience and annoyance as examples of the harm to individuals who receive unsolicited fax advertisements. Further we noted that, "unsolicited fax advertisements can shift to the recipient more than one hundred dollars per year in direct costs, . . . and . . . unsolicited fax advertising interferes with company switchboard operations and burdens the computer networks of those recipients who route incoming faxes into their electronic mail systems." Id. at 655. These harms, while small in reference to individual violations of Act, nevertheless represent compensable harms encompassed by a liquidated sum within the fixed amount.

-7-

We also believe that Congress intended the fixed damages available under the Act to be, at least in part, an incentive for private parties to enforce the Act. See Forman v. Data Transfer, Inc., 164 F.R.D. 400, 404 (E.D. Pa. 1995) ("The statutory remedy is designed to provide adequate incentive for an individual plaintiff to bring suit on his own behalf."). Because the actual losses associated with individual violations of the Act are small, this added incentive is necessary. Whether we view the fixed award as a liquidated sum for actual harm or an incentive for aggrieved parties to act as private attorneys general, or both, it is clear that the fixed amount serves more than purely punitive or deterrent goals. Also, the fact that Congress elected to make treble damages available separate from fixed damages strongly suggests that the fixed damages serve additional goals other than deterrence and punishment.

We also find that the complaint alleges an "INJURY" under the policy. The policy lists "private nuisance (except pollution), [and] invasion of rights of privacy or possession of personal property" under the definition of INJURY. It does not limit or qualify these terms in any manner. It sets forth technical definitions for neither "private nuisance" nor "invasion of rights of privacy." Accordingly, under Missouri law, we must apply ordinary, lay definitions to these terms. Looking at how Congress described unsolicited fax advertisements, see Nixon, 323 F.3d at 654-55, it is clear that Congress viewed violations of the Act as "private nuisances" and as "invasions of privacy" under ordinary, lay meanings of these phrases. Congress also stated:

Unrestricted telemarketing, however, can be *an intrusive invasion of privacy* and, when an emergency or medical assistance telephone line is seized, a risk to public safety.

Many customers are outraged over the proliferation of *intrusive, nuisance calls* to their homes from telemarketers.

\* \* \*

-8-

Individuals' privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in away that protects *the privacy of individuals* and permits legitimate telemarketing practices.

Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be *a nuisance and an invasion of privacy.*

\* \* \*

Banning such automated or prerecorded telephone calls to the home . . . is the only effective means of protecting telephone consumers from *this nuisance and privacy invasion.*

\* \* \*

Businesses also have complained to the Congress and the Federal Communications Commission that automated or prerecorded telephone calls *are a nuisance, are an invasion of privacy,* and interfere with interstate commerce.

47 U.S.C. § 227 (Historical and Statutory Notes, re: Section 2 of Pub. L. 102-243) (emphasis added) (internal quotation marks and numbering omitted). Although the above references cite pre-recorded or unsolicited telephone calls, we previously equated such calls to intrusive faxes, as did Congress when it defined prohibited conduct under the Act. See Nixon, 323 F.3d at 657 n.5 ("Artificial or prerecorded messages, *like a faxed advertisement,* were believed to have heightened intrusiveness because they are unable to 'interact with the customer except in preprogrammed ways.'") (quoting S. Rep. No. 102-178, at 4-5) (emphasis added). Universal offers only technical and restricted legal definitions to support its position that violations of the Act are neither "private nuisances" nor "invasions of privacy". Under Missouri law, we cannot restrict the undefined terms in such a manner.

We note also that the issue of Lou Fusz's intent is an open factual question and that intent is not a prerequisite to liability under the Act.[3] Intent is, however, relevant to coverage. The policy contains an exclusion which provides, "This insurance does not apply to . . . any act committed by or at the direction of the INSURED with intent to cause harm." Therefore, if a finder of fact ultimately determines that Lou Fusz not only violated the Act, but did so with an intent to cause harm, the policy would provide no coverage. Because coverage depends upon resolution of this factual question, the district court properly refused to rely on the policy's intentional acts exclusion.

Finally, we note that our case is distinct from a recent Seventh Circuit case which held an insurer did not owe its insured a defense against claims under the Act. See American States Ins. Co. v. Capital Assocs. of Jackson County, Inc., 392 F.3d 939 (7th Cir. 2004). There, the intentional nature of the violations appeared undisputed, and the policy specifically excluded from coverage any losses that were "expected or intended from the standpoint of the insured." The Seventh Circuit analyzed the issue of coverage under a definition for "invasion of privacy" where that term appeared only as a subpart of the broader term "advertising injury." The court noted that the term "invasion of privacy" had many meanings, including privacy in the sense of a right to seclusion (that could be violated by intrusions into private space) or a right to secrecy (that could be violated by public dissemination of private information). The court concluded that because the policy at issue only addressed "invasion of privacy" as a form of "advertising injury," "invasion of privacy" under that specific policy was

---

[3] The Act defines "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." 47 U.S.C. § 227(a)(4). The Act makes no exception for senders who mistakenly believe that recipients' permission or invitation existed. The issue of intent, or more accurately, the issues of knowledge and willfulness, however, clearly are material to the question of treble damages.

-10-

limited to secrecy-type privacy rights. The court further determined that intrusive and unsolicited fax advertisements only touched upon the seclusion-type privacy rights. Accordingly, invasions of seclusion through unauthorized faxes failed to meet the policy's limited definition of "advertising injury."

In the present case, by contrast, the policy defines advertising injury in a section that is entirely separate from the definition of INJURY that includes "invasion of privacy." There is no support in the present policy for a limited reading of the term "invasion of privacy." In short, differences both as to the insurance policies under examination and the facts of the alleged offenses make the Seventh Circuit's case inapplicable to the current situation.

We affirm the judgment of the district court.

-11-

A TRUE COPY OF THE ORIGINAL
MICHAEL E. GANS, CLERK
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
BY: _____